The 4th District Appellate Court of the State of Illinois has now convened. The Honorable James A. Kinect presiding. This is case number 419-0632 in re. The Estate of John Hirschfeld. Would the counsel for appellate please state your name for the record. My name is Eric Dorkin, D-O-R-K-I-N. Counsel for the appellee, please state your name for the record. This is Daniel Thies, T-H-I-E-S, on behalf of Mary Hirschfeld. Thank you. Counsel, you may proceed. Thank you, Your Honor. Your Honors, may it please the court. We are here, the appellants, seeking reversal of the trial court's grant of summary judgment on August 16, 2019 on the petition to contest the will filed by my clients directed at the will of John Hirschfeld, who passed and is represented by his executor, Mary Hirschfeld. I want to begin, I'll give the court a roadmap as to what I would like to address, subject obviously to the court's direction. But I want to begin by noting two of the standards for summary judgment that I don't think are controversial propositions of law, but which matter to my presentation most. One is that this court, as the court below, when considering summary judgment de novo, construes the evidence against the movement, which in this case was Mary Hirschfeld, the executor. The second one, I think, is even more important, where it's only when the undisputed facts admit but a single inference, does the issue become one of law for summary judgment. And so in my presentation today, I'm going to discuss the ruling on the lack of testamentary capacity, the ruling on the presumption of undue influence, the discovery process and the evidence struck time permitting. But I do really want to focus on the ruling on the lack of testamentary capacity. Because frankly, your honors, I believe the case begins and ends there in terms of review and summary judgment. Respectfully, I believe the trial court improperly balanced evidence to conclude that summary judgment was appropriate. And what I'd like to do is put forth to the court the two facts that I think were competing in where the trial court went wrong. The principal focus for any lack of capacity, any lack of capacity case is whether first, whether the decedent lacked the capacity to know the natural objects of his bounty. It is not our contention that this case is one where John did or didn't know his family. The third is whether he lacked the ability to dispose of his property with a plan in his own mind. That is not necessarily what we're addressing here. The second is, did he know the nature and extent of his property? And I submit to you from the record, he did not. I want to begin with the first undisputed fact as recognized by the trial court in paragraph 36 of his opinion, which is part of the appendix at 76. And that is that the property of 1402 Waverly was owned jointly by John and Mary. Now we come to the relevant portion of the will. And for purposes of lack of capacity on this test, this is my fact. I'm not relying on any other fact but this for the, well, I apologize. I'm relying only on the will for the evidence that he didn't understand his property. Here is the provision at issue. At the time of executing this will, I own a home at 1402 Waverly Drive. I submit to you that that is untrue. This is an attorney of 40 years telling this court, the court below, through his will, that property that was properly titled to he and his wife, he owned by himself. The will continues. If I own this home in my death, I leave my interest in the residence to my wife, Mary, for her life. Now, the trial court understood that maybe there was an error there, but the trial court's reason was it needn't be error free, and it wasn't really error, it was just a contingency. And this is a position that Mary the executor has taken as well. But I suggest to the court, what contingency could it be. If he already owns it with Mary, the only way he owns the home is if she dies, because then it is properly part of his estate. But if she dies, she can't get a life estate. The only other contingency that's conceivable is if Mary quit claim deed of the property to John, such that he could then give her a life estate in his will. And while these are possibilities, there is no evidence in the record that John considered these contingencies possible, or that they were even remotely in his consideration when the will was drafted. So we have two problems with this provision. One is the factual error that he owns the property free and clear, such that he can bequeath it to anyone. Counsel, how did he own that property? He owned it jointly with Mary. Is there any evidence in the record that shows that? Yes, it is stated by the trial court in his opinion as an undisputed fact in paragraph 36. Is the deed in the record? The deed is not officially in the record because it was not a disputed fact at the time, Your Honor. And you can find that on the appendix page 76 where he says this, that it is owned jointly between the two of them. And so as I said, we have two problems. One is he doesn't know the nature of his property. And then I suppose you could say I've always looked at it in preparing for this is that the second error was in nature, but it may be the plan in his mind that he's trying to bequeath property that he has no legal right to bequeath. Or, if he had the legal right to bequeath it, Mary predeceases him, he's leaving it to her with a life estate and that makes no sense. So once that fact is in existence... Why does that make no sense? Which part, Your Honor? That he would leave it to her if she quit paying back to him, that he would leave it to her in a life estate. That's possible. Well, why do you say that makes no sense? What I'm saying makes no sense is that she gets a life estate if she predeceases him. So there's two fact patterns that could take place. She doesn't quit claim deed it to him, but she predeceases him such that he owns the property. At that point, it makes no sense for him to give her a life estate. The only way to avoid that conundrum is if she were to quit claim deem it to him and then this makes sense. However, there's no evidence in the record that that contingency was ever discussed or considered by John in crafting the will. And so I submit to you that while the trial court could or this court could conclude it's possible that this works, the standard for summary judgment is, as the non-movement, I get the benefit of the doubt. And if there's an inference in my favor, that is, he didn't understand the ownership, then for purposes of summary judgment, it's improper. And I'm not saying that I win the case because of this. What I'm saying is that the jury, as fact finder, gets to weigh and balance my reading of the will with all of the counter evidence that the executor can muster at trial, but that it's improper for the trial court judge to wave away this problem and say that there's a possible explanation without providing, one, what that possible explanation is. While the trial court uses the words contingency and while Mary's counsel uses the words contingency, nobody explains what that contingency is. And that's what I submit to you are my two factuals. One doesn't make any sense. And the other, while it could make sense, there's no evidence in the record. Counsel, I have a question. Can there be a mistake in the drafting or in the plan going forward in that not come to the level of lack of testamentary capacity is simply a mistake? For instance, I don't, what type of law is fellow practice? You know, is this not a specialty? I would, I guess my response to that is twofold, Your Honor. I believe you are correct that there's a continuum of mistakes. So, for example, transposition of numbers on the address would not give rise to lack of capacity. Describing a piece of property in his will that doesn't exist, I think we probably all agree, would be fairly strong evidence that he lacked capacity. And we're somewhere in the middle where he's describing a piece of property that he does have an ownership interest in, but he gets his ownership interest wrong. So, is it fair for us to balance that inconsistency with all the consistencies and the couple of different wills and the other bequests? I think as soon as you're balancing respectfully, Your Honor, that's an issue for the trial court. And again, I'm not saying that my evidence as a matter of law would outweigh the executors. I'm simply saying that a jury, when confronted with all the evidence, could decide. And there's two facts I want to point out, and I sort of glossed over the first one. One is how the property passes, I think is problematic. But the other is his statement that I own the home. And I don't know that one needs to be an attorney of 40 years in real estate to know that if you've got a joint ownership interest, you do not, in fact, own the home. I have a fairly, a degree of longevity in the legal system. And if somebody said, do you own your own home or do you have a mortgage? I'd say, no, I own my own home. But it's jointly titled with my spouse. But and I might even say that in a formal setting, like if I was speaking to a bank officer, particularly since I'm aging. I mean, I don't disagree with you that this is different. But I, I don't really see it as an indicia of lack of capacity. I would say to the court that if we're if you can see it as odd, then I then I don't I just don't think that it's a summary judgment case. I think at that point, is it odd enough? Does it rise? What I hear the court saying is, does it rise to the level? And I think that's a jury a fundamentally a jury question. And again, I think it does rise to the level. I would argue to the jury that it rises to the level. But I will speak frankly, do I think I would be shocked if a jury said no, we didn't think it rose to the level. I think that that is when we can measure it up against the other things that he may have gotten right. But as soon as you have to look to other facts to argue this fact away. I think you're doing the jury's job, which requires the reversal of summary judgment. Well, let's say I leave my wife my 2015 Buick. And in fact, I traded it in. Yep. Before I wrote the will. And I've got a 2020 Buick. Does that mean she doesn't get it? Does that mean I lack capacity because I forgot that I traded cars every couple of years or I. Respectfully, I think you'd have to have a jury decide that question. Okay. In fact, I will I will tell the court in all of my mock arguments that's precisely the argument I used, where, what if somebody says I own something that either a I no longer own or never own. And the notion of what I could hear, and I believe the executor to your point about what you would say to the bank officer, the executor makes the point, and I will, I will quote him. Nothing suggests that this is meant to be a technical description of the form of ownership of the home. And I take that to be true in the setting you were describing where you're telling someone you own your home, where you're telling the bank officer your own your home. But when you're bequeathing property. I think, I think you are making a statement about whether or not you have the right and the authority to grant interest in this property. So that's the first argument as to why he lacks the path. I say to you why you end up balancing because you have to, in my view, if you have to argue the way you're doing the role of the jury. The second thing I would like to point to is a statement by the trial court that I don't believe holds up to scrutiny and I know what I think I know what the trial court meant. But the trial court said john's ability to list his assets supports the presumption of competence in your honor when you were making the point about sort of colloquial conversations. If you're going to praise his ability to list his assets. I think you have to praise him if he gets it right. And by not getting it right. I don't think we can rely on his ability to list his assets. What I think the trial court was focusing on was the, the, the personal property schedules on the back, but to the earlier questions again you're using a different portion of the will to counterpart counterbalance a different another portion of the will, and that I believe is summary judgment, particularly when he doesn't correctly identify his property. The next point I want to make is about the islet, the irrevocable life insurance trust, and to anticipate what I suspect maybe judge Turner's question, the, the islet was not a part of the summary judgment record it's a point that was made by Mr fees. It is a part of the lower, lower court record itself. It was an exhibit to the executors motion to dismiss. So it is a part of the lower court record it was not a part of the summary judgment record, I still believe this court can look at it, and I don't there's, I don't believe there's any prejudice and discussing it with the court given that the trial court and Mr fees discuss the substance of it in ruling and degree in the eye in the provision for pilot in the will. Miss john Hirschfeld divides up his estate, based upon the relative weight of what his children will get from the islet as he sees it. So he figures out from that number. What a 51% 49% split would look like to come up with a number for Mary. But when looking at the islet clear that it doesn't work, the way john thinks it works. The children do not get upon his death, the $470,000 or so dollars that he says in his will. The money is it was part of the divorce settlement with his first wife. She has first dibs on that money for her life. And only at her death. Does the money passed to her to the children through her power of appointment. So that's not to say, again, that it's impossible that the money reaches the children, but it doesn't reach them in the way that john said it would reach them in his will. And it doesn't and because of that, the split that he defines a 5149 is thrown a kilter, because they don't get the four seven, because as long as his first wife lives. She has the trustee is directed that she has first priority to those funds. So now I have two instances of john Hirschfeld getting his property wrong. And in response to the court's questions. How wrong did he get it. I think wrong enough for trial wrong enough that if you have to talk about other things to counterbalance it, you're doing what the jury should be doing. I've discussed the other issues in our brief, I will, I will stop at this point and allow response from my counsel thank the court. Thank you counsel. Mr. Thank you, Your Honor and may it please the court. I'd like to dive in right into this issue of testamentary capacity and what effect the alleged errors and the will have on it. And with all due respect to Mr Dworkin I think he's confusing two concepts. One is the, the way that a court on summary judgment evaluates facts and Mr Dworkin is correct that all reasonable inferences to be drawn in favor of the non moving party. But that's not what we're dealing with here. What we're dealing with here is a legal interpretation of a legal document like a contract will statute. On page 26 of our brief, we cite the state of Hearst case from the fourth district from this court that says that you can construe a will on summary judgment, just as you can interpret any other legal document, and the court did in fact do that in that case. So the question is not whether or not there's two different ways of reading the will and maybe there's some considerations on this side and some considerations on that side so it can go to the jury. No, the interpretation of the will is a legal question, whatever arguments are made it's a question for the court, and it can be decided on summary judgment. Now, there's really two ways that there could be an error in the will. One is if there was an error on the face of the will, just from reading the four corners of the document and that's the trial court looked at that and interpreted the will it determined there was not an error, and I'll go into that in a moment in more detail. But the other way is there could be an error is if there was something that's not apparent from the, from the face of the will but but is apparent from facts submitted by the petitioners. And that one really isn't at all at issue here because they didn't really submit any facts certainly not after the exhibits they submitted that were not authenticated and that had other problems were struck by the trial court. So we're not really playing in that realm we're really solely playing in the realm of is there an error on the face of the will, which again is a legal question, which the trial court appropriately addressed with this court, and also address. Now as to the question. Well, before I get into the question of was there a will I also want to emphasize the relevant legal standard. So, Mr Dorkin mentioned the three prongs of the testamentary capacity test and he's focusing on whether Mr Hirschfeld knew what his property was. He comprehended the kind and character of his property. There's a gloss on that standard that comes from the Chevron V Jackson case is the Illinois Supreme Court 1955. And in that case the court gloss that standard by saying where a man has sufficient mental capacity to transact ordinary business and act rationally in the ordinary affairs of life. He has sufficient mental capacity to dispose of his property, I will. So it doesn't say that if you're an attorney, you have to be a competent attorney. It doesn't say you apply a legal malpractice standard on Hirschfeld had been giving this advice and doing a will for somebody else. And he made a mistake and committed legal malpractice. One thing. That's not the question here. The question is solely Does he have the capacity to transact ordinary business act rationally in the ordinary affairs of life. And that's where justice connects points I think is spot on that when you're the average ordinary person is talking about whether or not they own their home. They say I own my home, even if they own it jointly with a spouse. That's extremely common way of speaking and john Hirschfeld spoke exactly the same way here by saying I own my home. We get to the question of, is it an error. And the trial court below said no. It's a contingency and Mr. Dorkin challenges my side of the case, I think, by saying, well, can you explain what the contingency is, how could it be possible. And the answer is, as is clear from the record, Mary and john at separate finance. Right. This was a second marriage Mary kept her own bank accounts john kept his own bank accounts. And in that context, it's not uncommon for one spouse to sell an interest in property to the other. They're intending to keep their property. And so it is extremely conceivable that john Hirschfeld would have paid Mary at some point for her half of the house and had her quit claim her interest to him. That would have been a way of giving Mary additional liquidity of transferring some of john's assets to her. It's a rational decision that a married couple could make So just looking at the four corners of the will and knowing that that is a possibility. There's no evidence that there's any air. In fact, it would be very reasonable for john to say, let's say I you know I buy your half of the house. I give you a few hundred thousand dollars for it. And then I die. You're still my widow. I want you to be taken care of. So in that case, if I own my home at my death. I give you a life. That's a very common estate planning procedure to make sure that the deceased spouse spouses out the widow or widower has a place to live for the remainder of her life. As kind of a corollary of that point I'd I'd note obviously john Hirschfeld understood what a life estate was he drafted this well and he was able to Put that concept into the will. He understood it. It doesn't make a lot of sense to argue that he understand what a life estate was, but he didn't understand what owning a house and joint tenancy. Has the capacity to understand a life estate. Yes. You move to strike deep from the appendix. If the court. Allowed your motion to strike the deep since it's not part of the record. Does that make any difference on how we decide this case, um, I don't think so. Council's correct. I mean, we do admit it's an agreed fact that they own their house and joint tenancy without an abundance of caution. We moved to strike because I didn't want them to rely on the deed for some other fact that maybe I hadn't thought of, and it was not By the entirety It was held as a tenancy by the entirety. Yes. Same, same question with regard to the Irrevocable life insurance trust. That one. I don't think it's proper for the court to consider as counsel admitted it was not part of the summary judgment record. They very easily could have attached it to their response on summary judgment and they did not So I don't think the court ever had that properly before it below and I don't think it should be considered as part of this record. Okay, thank you. One additional points on the error, which I don't want to gloss over because it ties into our larger argument, which is the same provisions about the house. You know, I own a house on Waverly Drive. If I own that house in my death. I give a life to say to Mary, the same provisions are in the 2004 will john Hirschfeld executed And that's before any of the alleged mental problems before any of the issues that petitioners are relying on to show lack of testament very acid here. And so if he came up with this scheme before you had any health issues and you just kept the scheme in place in 2006 Again, that's, that's evidence that it's not an error. That's evidence that it was part of what he wanted to do. This was a carefully planned out scheme to make sure that if he bought Mary's half of the house from her Mary would still have a place to live when he died. So as to the irrevocable life insurance trust. Again, I don't think it should be considered. But even if it were to be considered That's not an error either and petitioners admitted below at our 247 to 248 That it was a possible outcome that the seven children would receive the $470,000 exactly as john Hirschfeld expected and the will in fact couches it in this terms, the will says, I expect that my seven children will inherit about $470,000 And that's the key language because that's, that's all the will ever does. You can only expect future events and try to make some some accommodation for for your loved ones to try to account for those There's never 100% certainty. This is the world state planners operate in john Hirschfeld would have known it's possible that's not going to happen. Maybe my first wife Rita is going to have a horrible accident and is going to exhaust the funds in the trust for her medical care. Certainly, that was possible, but that doesn't make it an error. That's just the normal contingency is the expectations that happen in a state. So moving on from the alleged errors. I do want to touch on the other evidence, the affirmative evidence for summary judgment, which was entirely unrefuted Because I think that it's important to have that context as well. And this evidence falls into three categories. And the first is the evidence from the will itself just from reading it And seeing that it's essentially the same as the earlier will that john signs in 2004 and I included both wills and the appendix of our briefs that you could easily flip back and forth and compare them side by side. Both wills keep the same basic plan of distribution, which is the 5149 split with the first 495,000 going to marry to offset the needs of life insurance trust. Both wills have that same setup and there's only four small and very logical reasonable changes that happened between 2004 and 2006 And the reasonableness and appropriateness of these changes demonstrates that john knew what he was doing that he had the ordinary capacity to transact the affairs of life in 2006 The first change is that john had another granddaughter. Born in 2005 and between the two wills and he wanted to make sure that she was listed with her siblings as a successor beneficiary in paragraph for a section two of the will the very rational reasonable thing to do. Second change in section two paragraph three is a slight change to the list of assets from which Mary could select her $495,000 It was a long list to start with in 2004 but he added one thing in 2006 which is quote my goal as another asset that she could select from It makes sense to include all substantial assets. That's just gives Mary, a little bit more flexibility and inheriting that 495,000 The third change is that the 2004 will listed Don Aldean john Hirschfeld former law partner as his executor and Mary as a successor executive In 2006 he changed that to replace Don Aldean with Mary as executor and that too makes sense because Don Aldean had retired, which is apparent from his deposition in this case. So he knew what was going on john appreciated all the dynamics and he made an appropriate change. And then the fourth change is that there are minor changes to the schedules of personal property about who gets what and it's true Mary got slightly more To the tune of some old golf balls, some patches and decals and one old car worth $3500 that's additional property that Mary got in 2006 that she didn't get in 2004 So I would just say if Mary is really unduly influencing john or coming up with a scheme here in order to benefit herself. She didn't do very well. She ended up with some more golf balls and some patches and decals and an old car. That's the difference between 2006 and 2004 that we're arguing about here. So that's the first category of evidence. The second two are quicker. Number two is the testimony of every witness to the 2006 will and the 2004 will including the notary All of whom testified that john was competent and able to make a will all signed self proving affidavits which are admissible in court on this issue under the recorded recollection exception to the hearsay rule. And every single one of them agreed that they would not have signed as john's witness if they didn't think that he was competent. One of the witnesses in 2004 also remembered having a conversation with him talking to him and ascertaining that he was competent and able to sign the will That's the second category. The third category of evidence is is evidence about john's activities again tending to prove that he was able to transact the ordinary affairs of life. And that evidence includes that he was the one handling the checkbook. He was signing checks balancing the textbook doing that in two different accounts. And he was also making plans and signing documents to sell his farm in southern Illinois. And there's some documents in the record related to that as well in our appendix at SA 38 to 39 So all of that evidence is unrefuted. There is, you know, in a case like this, you would expect to see the petitioners present Something along the lines of somebody who knew john Hirschfeld back in 2006 and could say, yeah, he was slipping. I really think he didn't understand things. There's none of that. Nobody testified Alternatively, you might think there would be some medical records that would show some kind of diagnosis. There's nothing petitioners did not submit any medical records. So the law is quite clear when one party submits evidence and the other party submits nothing to refute it that the first parties evidence is taken as true. On summary judgment and none of that evidence is repeated again. There's a similar story on the undue influence count and I'll briefly touch on on on that. There's two prongs of the test that we challenge. One is the question of whether or not Mary was involved in procuring the will which they have to show in order to get a presumption of undue influence. And there's four pieces of evidence here again all unrefuted that Mary had nothing to do with preferring the will The first is evidence from Sherry Buck Reynolds, who is the legal secretary at Meijer Capel who worked with john to prepare the will And she testified that she only ever dealt with john she never talked to Mary about it john called her up and told her what he wanted. And then she executed it and that's that testimony is confirmed by a note of a call that john made to Sherry Buck Reynolds, where he outlines exactly the changes that were made in the 2006 bill. Then you've got again the testimony of the three witnesses and the notary in 2006 he said Mary was not around when he signed the will Then you've got Mary's affidavit that said, I didn't even know john was preparing a new will at that point I had nothing to do with it. We never talked about it. And then again, you've got the consistency of the wills between 2004 and 2006 which is not what you would expect if Mary was taking advantage on Now in their brief they are petitioners argue that none of this matters because john was acting as his own attorney and thus if he was preparing the will at home. Mary was also at home and maybe she influenced That kind of speculation is not appropriate on summary judgment. And in particular, it's not appropriate on the question of whether or not you apply a presumption of undue influences against spouses. Because the Illinois Supreme Court has cautioned that the presumption of undue influence should be applied with caution to marital relationships. And in particular, you expect spouses to be close to one another and to influence what they do with each other that doesn't make it undue influence. So you can't infer simply from the fact that Mary was at home with john that she would have exerted some kind of undue influence And then the other prong we challenge is the dominance prong which to get the presumption of undue influence, they have to show that john dominated was dominated by Mary. And again, this is refuted by all the evidence showing that john was handling his own finances that he was the one who was drafting the wills. And that he was the one who was in a position of control when it came to estate planning it as Petitioners like to argue, he was an attorney. He did have experience with the state planning, but that that speaks to him being the dominant one. He knew what was going on. He understood what a life estate was Mary would not have as a lay person. And so there's nothing to support the argument that Mary dominated john other than again pure speculation. And then just to touch on the discovery issues, Your Honor, briefly from because I know petitioners in their reply brief rely almost exclusively on the argument that it was error for the trial court not to set a discovery schedule. There's no case that says that trial courts have extreme discretion when handling discovery, they get to decide When to end discovery and when to allow more. And so it was no error, not to set a discovery schedule and in fact petitioners never asked Hello 180 days into the case. If they thought a case management conference sort of happened in a discovery schedule should have been set 180 days and they could have stopped and asked them. They didn't. They waited until all the way at the end and the argument on summary judgment when they said, Oh, wait a minute. We need more discovery. And in fact, the, the framework, the court should apply to this question of whether more discovery is appropriate is the framework laid out in Supreme Court rule 191 be So it's not just a question of whether or not A discovery schedule should have been said it's a question of whether petitioners met the 191 be standards, which is necessary in order to get more discovery and more time to respond to a summary judgment. For all the reasons cited in our brief This news did not meet those standards they listed a number of witnesses. They wanted to pose, many of which were irrelevant didn't even know john Hirschfeld until years after he had signed the will And in other cases petitioners clearly knew about those witnesses. They have subpoenaed some of them long before the summary judgment motion was filed. And so they also failed to show why they couldn't obtain the evidence they needed much earlier. So, Your Honors. Thank you for your attention and your time. I'm happy to answer any other questions, but otherwise I will be happy to leave it there. Thank you very much. Do you know questions have rebuttal. Thank you. I was looking for the site. I'm, I know it's in our brief, we did ask for discovery dates and on the rule to 18 rule to 18 does say that the court shall enter cut off dates and in their brief they cited Bright, I believe, an Illinois Supreme Court case that was decided five months before will to 18 became the new rule for courts in Illinois. So the rule is under to 18 you're supposed to avoid surprise by setting a schedule that orderly does written discovery orderly does oral fact discovery and sets expert discovery cut off dates dispositive motion cut off dates and trial dates. That's the norm in practice that wasn't done. But I want to go back to the issue of looking outside the will and on the face of the will. You always have to look outside the will. It's never from the face of the will. You have to link up what the testator is saying in the will to the property that he or she does or doesn't own And respectfully, if he got every single piece of property in the schedule right but but misstated his single largest asset. I don't believe that summary judgment would be proper. So the question we have before us today, hearkening back to the questions of my when I was speaking is, is this enough. And truthfully, if you're asking, is it enough. You're saying there is a potential inference that he didn't understand how we own the property council said repeatedly. It's very common. It's very common commonalities, not in the record, respectfully. Whether that that would be rebuttal to our argument. It's very common for husbands and wives to do this. It's very common for quit claim deeds. I don't know that. I don't know that it is common. How often do or how often should an estate planner expect quit claim these between spouses. That's a countervailing fact that the executor could put into evidence to show that our reading of that provision and property ownership is off base. But counsel telling you that it's common. That's not in the record. And I don't, in fact, believe it's supported by what is practice. I want to talk about Chevron quickly. Chevron was after a trial. It was a directed verdict, but there was a trial in in Chevron, the ordinary business, the only countervailing evidence that the plaintiffs had in Chevron was typographical errors. And this goes to my continuum point earlier, I believe that the devil, the Chevron court was correct to say that the misspellings don't outweigh the ordinary business, I accept that. But I don't believe that's where we are on the continuum. In this case, we're not talking about misspellings. We're talking about misunderstanding the fundamental nature of the home ownership and misunderstanding. And just quickly, it's not his expectation. The provision that will says, because the children will receive the above proceeds. They will receive it. In truth, they won't. If his first wife survives him, they will not get those proceeds, they will get some portion of those proceeds, but they will not get those proceeds. Finally, on the 2004 will We have a burden of sequentially doing the wills. We have to do the August 2006 will first. We then have to do the February 2006 will. Why was there February 2006 will? I don't know. Then we have to do the 2004 will. But saying that he got it wrong a bunch of times isn't evidence that he had capacity in 2006. It suggests a much larger problem that went to 2004. And just to be clear, the attesting witnesses, the will was not read. There's not a single witness that could say he understood the terms of the will. They could say he carried on a conversation, but not that he understood the terms of the will. And what we're saying is that the basis for reversal is that he did not fundamentally understand the terms of the will. For those reasons, Your Honor, respectfully, we ask that you reverse the grant of summary judgment. Allow the parties to fully and fairly complete discovery, so that there might then be a trial on the merits. Thank you very much. Thank you, counsel. We'll take this matter under advisement and stand in recess.